# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No. 17-22153-CIV-GAYLES

FRANCOIS SEVERE, as Personal
Representative of the Estate of FRITZ
SEVERE,

    **Plaintiff,**

  **v.**

CITY OF MIAMI and ANTONIO
VICENTE TORRES, IV, individually and in
his capacity as a City of Miami Police
Officer,

    **Defendants.**

_____/

## <u>ORDER</u>

 **THIS CAUSE** arises from Defendants', Officer Antonio Vicente Torres, IV, and the City

of Miami (collectively, the "Defendants"), Motion for Summary Judgment (the "Motion for

Summary Judgment") [ECF No. 56] and Defendants' Motion in Limine to Exclude Testimony of

Mr. Charles Drago (the "Motion in Limine") [ECF No. 58]. The Court has reviewed the motions,

the record, and the applicable law. For the following reasons, Defendants' Motion for Summary

Judgment is granted in part and denied in part. Defendants' Motion is granted as to Count I –

Plaintiff's Section 1983 excessive force claim against the City of Miami (the "City") and denied

with respect to Count II – Plaintiff's Section 1983 excessive force claim against Officer Antonio

Vicente Torres, IV ("Officer Torres"). Plaintiff's Florida Wrongful Death Act, Fla. Stat.

§§ 768.16–768.28, claims against both Defendants, Counts III and IV, are dismissed with

1

prejudice for failure to state a claim on which relief can be granted. Defendants' Motion in Limine is granted as to Mr. Drago's second and third opinions but denied as to all others.

## BACKGROUND

This action challenges Officer Torres's use of deadly force that resulted in Fritz Severe's ("Severe") death during an investigatory stop. At the heart of the case is whether Officer Torres violated Severe's Fourth Amendment right to be stopped and/or seized without excessive force when he shot him ten times after Severe was incapacitated.

## I.   The June 2015 Shooting

Gibson Park is a community park in Miami that contains a football field, bleachers, and a grassy area. Across the street is a public library, Culmer Overtown Branch Library. There are two grass lawns in front of the library, separated by a walkway leading to the front door. The distance across the walkway is about nine feet; the distance from the edge of the walkway to the front door is about thirty-two feet.[1] *See* Appendix A.

Antonio Sanders, a City employee, led one of many summer camps at Gibson Park football field during the summer of 2015. On the morning of June 11, he noticed a Black man wandering near the field and carrying a long metal object and a big black bag. Sanders became concerned for the campers' safety and called 911 to report that a Black homeless man had threatened him with a metal rod.[2] The dispatch agent assured Sanders that officers were on the way. The agent radioed in a "32," the police code for an assault or battery, and informed the responding officers that the

---

[1] The Florida Department of Law Enforcement ("FDLE") crime scene analyst prepared a sketch of the area. [ECF No. 57-19]. Although the sketch is not to scale, it provides context for the scene and details measurements of the walkways. [*Id.*].

[2] All of the deposition testimony refers to the metal stick Severe carried as a rod, stick, cane, or object. For ease of reference and with the benefit of observing the instrument at oral argument, the Court shall refer to it as a rod.

suspect "was armed with a metal object [and] threatened to hit the complainant." [ECF No. 57-4, 2:8–9].

Officers Ervens Ford and Antonio Torres responded. Because the officers were conducting a training exercise that day, Officer Torres, the senior officer, was dressed in street clothes to allow Officer Ford to take the lead in any situation they encountered. Upon arrival, they spoke briefly to Sanders, who informed them that the man had moved away from the field and towards the library. Sanders also told the officers that the man had not attacked him and no one was ever in any real danger—he just wanted the man to move away from the field where the campers were. Kwameshia Rich, another City employee, approached Sanders and the officers to inform them that there was no longer a reason to complain because the man was moving away from the field. She also told them that the man was a regular in the area and had never caused a problem. Both Sanders and Rich accompanied the officers towards the library.

As they approached the library, the group observed a Black man, now identified as Severe, carrying a metal rod and black bag near the library entrance. Sanders identified him for the officers. Video surveillance captured Severe approaching the library, turning towards Officer Ford, then turning back around as if to enter the library, then turning again and moving toward Officer Ford, lifting the rod as he moved out of the frame. Officer Ford testified that Severe turned in response to his call and instruction to approach the officers and not enter the library. At that time, although the testimony varies, Severe was anywhere from 10 to 32 feet away from the officers.

As with many police shooting cases, the next few seconds were quick and decisive. Indeed, the entire event lasted less than three minutes from the time Officers Ford and Torres arrived at the park to the time Severe was shot. In addition to the officers, several independent witnesses gave varying accounts of what occurred.

Severe began to raise the rod as he approached the officers. Walter Dennis, a witness who stood near the perimeter of the scene, testified that Severe had raised the stick above his head and was "flaring" his arms. [ECF No. 57-9, 9:12]. Aja Kareem Hayward, another witness who stood at the library entrance, described Severe as "swinging" the metal rod "like he [was] getting ready to swing and hit the police." [ECF No. 49-7, 28:16–18]. He compared Severe's movements to that of a baseball player, holding the rod like a bat as he stood a relatively short distance away from the officers. [ECF No. 49-7, 29:1–8]. However, Rich testified that she never saw Severe "wave the stick at [Officer Torres] at all." [ECF No. 49-3, 14:5].

The officers instructed Severe to put the rod down at least once. Sanders, who was "shoulder to shoulder" with the officers, testified that he heard commands to "drop the rod." [ECF No. 57-3; 26:24, 32:8–10]. Hayward agreed that the officers told Severe to "put it down." [ECF No. 49-7, 27:25]. Pamela Jefferson, a library employee, testified that Severe was told to put down the "object in his hand . . . and he just was waving it." [ECF No. 57-8, 20:12–16].

Despite the commands, Severe continued to approach the officers with the rod raised. [ECF No. 57-3, 28:22–25, 30:11–12]. Hayward testified that Severe got "aggressive" as the officers continued to command him to lower it. [ECF No. 49-7, 28:15]. Officer Ford testified that Severe got "into a fighting stan[ce] and said something in the aspect of you're going to have to make me leave." [ECF No. 57-5, 17:12–15].

Officer Torres testified that he pulled out his firearm while Severe was still at least ten feet away from him. [ECF No. 57-1, 117–118]. He testified that Severe then ran towards him and "lunged" at him from about four or five feet while holding the rod raised like a baseball bat. [ECF No. 57-1, 118:14–20]. Officer Ford described Severe as "charging" towards Officer Torres. [ECF

4

No. 57-5, 49:7]. However, Dennis testified that he never saw Severe run at or lunge towards the officers. [ECF No. 57-9, 15:7–8].

Officer Ford holstered his firearm and instead went to draw his taser. In that same moment, Officer Torres began shooting Severe. Officer Torres shot Severe ten times. Although paramedics tried to revive him on the scene, Severe died from his gunshot wounds.

Dennis testified that Officer Torres shot Severe from about four or five feet away. [ECF No. 57-9, 15:3–4]. Rich testified that they were about two feet apart. [ECF No. 49-3, 63:14–24]. Eddie Palsey, another City employee who witnessed the shooting, estimated a distance of "ten, twelve" feet. [ECF No. 57-11, 44:20]. Others described the distance between Officer Torres and Severe as relative to the sidewalk, the grassy area, and the bleachers—an area that the crime scene sketch catalogues as up to 32 feet long and 9 feet wide. [ECF No. 69-1]. Officer Ford could not clearly determine the distance between the two. [ECF No. 57-5, 43:10–22]. Sanders testified that, by the time of the shooting, Officer Torres and Severe were "maybe about four to five feet" apart. [ECF No. 57-3, 30:11–12]. Importantly, Sanders also testified that Severe was "too far away" at the time of the shooting to hurt the officers with the rod. [ECF No. 57-3, 33:2].

Severe may have tried to run away as Officer Torres started shooting. Jefferson testified that after Severe was shot, "he was trying to get away, right, and he was going to the right hand direction." [ECF No. 57-8, 23:22–25]. Hayward testified that Severe "was in a different spot from when he was attacking to when he fell on the ground. He didn't fall on the ground where he got shot at." [ECF No. 49-7, 47:14–16]. Rich testified that Severe ultimately fell across the walkway from the officers. [ECF No. 49-3, 28:1–4].

Rich also testified that Officer Torres continued shooting after Severe fell to the ground: "He had to shoot him at least five times before he went down, but when he was on the ground he

still shot." [ECF No. 49-3, 29:16–18]. Dennis described Severe's body as "jumping" as he was shot "several times," as if he was "being lifted off the ground or something, I don't know. It was just a horrible thing to see." [ECF No. 57-9, 10:15–23].

Officer Torres testified that the situation escalated from "nothing to deadly in seconds." [ECF No. 57-1, 113:21–22]. Officer Torres also testified that, "[y]ou don't have to go two rounds, if you see they are still coming at you, you engage until the threat is neutralized . . . I stopped firing when he went down." [ECF No. 57-1, 125:2–12]. Notably, Hayward and Dennis both testified that Severe was a "frail," "old," "not agile," and homeless man who would have been unable to hurt the two able-bodied younger police officers with the rod. [ECF Nos. 49-7, 35:9–13; 49-4, 33:3–8].[3]

## II.    FDLE's Investigation

The Florida Department of Law Enforcement ("FDLE") conducted a criminal investigation into the shooting and determined that Officer Torres was legally justified in using deadly force. The Miami-Dade State Attorney's Office agreed and declined to file criminal charges against him.

As part of the investigation, a medical examiner conducted an autopsy of Severe and determined that the cause of death was gunshot wounds. Pictures from the autopsy reveal ten bullet wounds. [ECF No. 69-5]. Six of the wounds are on the left side of Severe's body (including three through his left arm).[4] Two rounds entered Severe's left upper back and one entered his right lower back. One round entered his right lower buttock at a slightly upward angle towards his pelvic

---

[3] According to the autopsy report, Severe was five feet, six inches tall and 165 pounds, and—although Severe appears much older in the surveillance video—he was 45 years old at the time of his death. [ECF No. 57-16, at 4].

[4] In her deposition, the medical examiner explained the difference between penetrating and perforating gunshot wounds: "A penetrating gunshot wound is when a projectile or bullet goes into the body and stays in the body. A perforating gunshot wound is when the bullet goes through the body. It goes in and also comes out." [ECF No. 57-15, 19:13–17].

cavity. The medical examiner testified that there was no way for her to determine the order in which the bullets struck. But, she agreed that it was likely the shots to his left front and left side came first, followed by the penetrating shots to his back. [ECF No. 57-15, 42:7–24]. The medical examiner did not find any gunpowder residue or stipling on Severe that would indicate that Officer Torres shot him within the boundaries of two to three feet or less. [ECF No. 57-15, 21–22].

The medical examiner also testified that she could not clearly determine what Severe was doing when he was shot. Based on her examination of his body, she opined that the gunshot wounds to Severe's left arm, which held the rod, were inconsistent with Severe approaching the officers with that arm raised overhead. [ECF No. 57-15, 24:4]. But she also opined that it was possible that Severe approached the officers in a batter's position with the rod raised to some level. [ECF No. 57-15, 54–56]. The medical examiner further testified that, based on the position of the gunshots, Severe may have changed positions while being shot. [ECF No. 57-15, 41:23–24]. But she could not provide a definitive answer to what happened.

### III. This Litigation

Francois Severe, representing the estate of Fritz Severe,[5] brought four claims against Defendants: Count I – Section 1983 excessive force against the City, Count II – Section 1983 excessive force against Officer Torres, Count III – Florida Wrongful Death Action against the City, and Count IV – Florida Wrongful Death Action against Officer Torres. [ECF No. 103]. Defendants filed their Motion for Summary Judgment and concurrently filed their Motion in Limine. The Court held a hearing on the Motions, both of which are now ripe for review.

---

[5] For ease of reference, the Court shall refer to the decedent as "Severe" and to his estate, which acts as Plaintiff in this action, as "Severe's estate."

The Court first evaluates the claims brought under 42 U.S.C. § 1983. For the reasons set forth below, the Court finds that Severe's estate has not presented legally sufficient evidence to meet his burden under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) ("*Monell*") and that Defendants' Motion in Limine must be granted as to the expert's opinions on the City's liability.

The Court next concludes that Officer Torres is not entitled to qualified immunity. Three issues of material fact concerning the reasonableness of his decision to use deadly force exist: (1) how far apart Severe and Officer Torres were when the shooting began, (2) what Severe was doing in the moments before Officer Torres began to shoot, and (3) whether Officer Torres continued to employ deadly force after Severe no longer posed a serious threat of physical injury to the officers. Moreover, the use of ten shots to subdue Severe was clearly excessive given the circumstances. The Court also determines that the law on excessive force was clearly established at the time of the shooting. Defendants' Motion must therefore be denied as to Officer Torres.

Finally, the Court finds that Severe's estate has failed to state a claim under Florida's Wrongful Death Act, Fla. Stat. §§ 768.16–768.28, because there is no cause of action for negligent use of force in Florida.

## DISCUSSION

### I. Legal Standard

Summary judgment, pursuant to Federal Rule of Civil Procedure 56(a), "is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam) (quoting Fed. R. Civ. P. 56(a)). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

An issue is "genuine" when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the nonmoving party. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). And a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). "[C]ourts may not resolve genuine disputes of fact" when reviewing on summary judgment; rather, summary judgment is appropriate only where all that remains are questions of law. *Tolan*, 572 U.S. at 656. The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *SEC v. Monterosso*, 756 F.3d 1326, 1333 (11th Cir. 2014). However, to prevail on a motion for summary judgment, "the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).

## II.     Count I – Section 1983 Claim Against the City

In Count I, Severe's estate seeks to hold the City liable for Officer Torres's excessive force.[6] A city's liability under Section 1983 may not be based on the doctrine of respondeat superior. *Monell*, 436 U.S. at 694. Instead, a city is liable "only for acts for which the [city] is actually responsible" and only when the city's "official policy" causes a constitutional violation. *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1027 (11th Cir. 2001) (en banc) S*ee also Monell*, 436 U.S.

---

[6] As a prerequisite, Severe's estate must establish that Severe suffered a constitutional violation. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). Because the Court finds that a Fourth Amendment violation did occur, *see infra* at pp. 16–25, the Court proceeds with a *Monell* analysis.

at 694. To state a Section 1983 claim against a municipal entity, a plaintiff must "identify a municipal policy or custom that caused [his] injury." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997) (citations and internal quotation marks omitted). Severe's estate therefore must use one of two methods to establish that a custom or policy existed: "identify either (1) an officially promulgated [City] policy or (2) an unofficial custom or practice of the [City] shown through the repeated acts of a final policymaker for the [City]." *Grech v. Clayton Cnty.*, 335 F.3d 1326, 1329 (11th Cir. 2003). Because a city will rarely have an officially adopted policy of permitting a particular constitutional violation, most plaintiffs—Severe's estate included—must show that the City has a custom or practice of permitting the constitutional violation and that the City's custom or practice is "the moving force behind any alleged constitutional violation." *Id.* at 1329 n.4 (citations and internal quotation marks omitted).[7]

"To prove Section 1983 liability . . . based on custom, a plaintiff must establish a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)) (citation and internal quotation marks omitted). "Normally random acts or isolated incidents are insufficient to establish a custom or policy." *Whitaker v. Miami-Dade Cnty.*, 126 F. Supp. 3d 1313, 1321 (S.D. Fla. 2015) (quoting *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986)) (finding that four isolated shootings did not "establish a widespread practice that, although not authorized by written law or express municipal policy, is so permanent

---

[7] Severe's estate does not purport to establish liability under *Monell* for an official City policy. Thus, the Court's analysis focuses solely on whether an unofficial custom or practice exists.

and well settled as to constitute a custom or usage with the force of law" (quoting *Brown*, 923 F.2d at 1481) (internal quotations omitted)).

"In limited circumstances, a local government's decision not to train certain employees . . . to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (noting that a failure to train can be "properly thought of as a city 'policy or custom'") (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)). To use this method, a plaintiff must establish that the "municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights." *Gold*, 151 F.3d at 1350. The policy may be proven by showing that the failure to train evinced a "deliberate indifference" to the rights of a municipality's citizens, *id.*, and a "pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate" such a deliberate indifference, *Connick*, 563 U.S. at 62 (quoting *Brown*, 520 U.S. at 409).[8]

Severe's estate claims that the City had a custom, practice, or unofficial policy of using excessive force because it failed to train officers in the proper use of force and failed to adequately investigate or discipline alleged uses of force. It offers two Department of Justice documents, a Report from 2013 (the "Report") and a subsequent Memorandum of Understanding from 2015 (the

---

[8] As an alternative means of demonstrating the City's liability under *Monell,* Severe's estate could have identified a final policymaker responsible for implementing the policy. "[A] municipal official who has 'final policymaking authority' in a certain area of the city's business may by his or her action subject the government to § 1983 liability when the challenged action falls within that authority." *Brown*, 923 F.2d at 1480. *See also Cuesta v. Sch. Bd.*, 285 F.3d 962, 968 (11th Cir. 2002) ("Even in the absence of an express policy or custom, a local government body can be held liable 'for a single act or decision of a municipal official with final policymaking authority in the area of the act or decision.'" (quoting *McMillian v. Johnson*, 88 F.3d 1573, 1577 (11th Cir. 1996))). But Severe's estate has not identified a City official who acted as a final policymaker to satisfy *Monell* under this method.

"MOU") (collectively, the "Department of Justice documents"), and the opinion of its expert, Mr. Charles Drago, to support the claim. None are sufficient.

First, the Court finds that the Department of Justice documents are not relevant. Both documents suffer a fatal flaw: they detail violations from years prior to Severe's shooting in 2015. The Report, which made no findings past 2011,[9] concluded that the City failed to train on excessive force and, as a result, had seen an increase in police shootings during those years.[10] [ECF No. 69-4, at 2]. The MOU, which made no findings past 2013, found that problems remained with the City's investigations and trainings at the end of 2013. [ECF Nos. 57-14; 57-24]. Consequently, neither of the Department of Justice documents can be used as evidence of violations in 2015 without some other evidence tying them to that year. Severe's estate has offered no such evidence. The MOU also presents a second problem: It required the City to address its violations by transferring responsibility for its investigative procedures into police misconduct to FDLE. [ECF Nos. 57-14, 1–2; 57-24, 8–10]. The MOU made no findings that FDLE was somehow incapable of handling these investigations or was committing the same violations as the City. And Severe's

---

[9] The Court has not independently identified any cases where the Report was accepted as evidence to overcome *Monell* at summary judgment for shootings occurring after 2011. *Cf. Pozdol v. City of Miami*, 996 F. Supp. 2d 1290, 1298–300 (S.D. Fla. 2014) (allowing the Report to be entered as evidence for a case involving a shooting from 2011).

[10] The Court also notes that a March 10, 2016, agreement between the Department of Justice and the City of Miami states that the Department of Justice "affirmatively acknowledges that the findings letter dated on or about July 9, 2013, was not meant to satisfy the requirements of Sec 803(8) of either the Federal Rules of Evidence or the Florida Evidence Code for admission by non-parties to this Agreement in a State or Federal Court" and provides that the Agreement "shall not be construed as an admission or evidence of liability under any federal, State, or municipal law including 42 U.S.C. § 1983. Nor is the City's entry into this Agreement an admission by the City, [the Police Department], or its officers and employees that they have engaged in any un-constitutional, illegal, or otherwise improper activities or conduct." [ECF No. 57-24, at 2]; *see Picardat v. City of Miami*, No. 15-cv-24305, 2017 WL 1251897, at *7 n.9 (S.D. Fla. Apr. 5, 2017).

estate does not dispute that the revised procedures were followed here. Accordingly, neither of the Department of Justice documents are relevant to Severe's claim.

Second, the Court finds that the second and third opinions of Severe's expert, Mr. Charles Drago, are not material. Mr. Drago opined that the City's custom of failing to train or investigate its officers' use of deadly force extended into 2015. [ECF No. 58-1, 13–15]. To form those opinions, Mr. Drago relied solely on the Report and the investigation of Severe's shooting. [*Id.*]. Mr. Drago's reliance on the Report is misplaced. The Report was over four years old at the time of the shooting. He also did not point to any additional post-2011 failures to investigate to bolster his opinion that the pattern still existed. *See Whitaker*, 126 F. Supp. 3d at 1321 (four isolated shootings did not establish a custom). And FDLE investigated the shooting, not the City. Without more, Mr. Drago's opinions on this issue are immaterial and cannot be used to defeat summary judgment.

Severe's estate has provided no evidence to establish the existence of a widespread practice—only mere allegations, which the Court need not accept. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The Court finds Severe's estate has failed to establish Section 1983 liability against the City based on custom or an unofficial policy, and summary judgment must be granted to the City as to Count I.

## III.    Count II – Section 1983 Claim Against Officer Torres

In Count II, Severe's estate argues that Officer Torres violated Severe's Fourth Amendment right to be stopped or seized without excessive force when Officer Torres shot him ten times without justification. Defendants counter that Severe was charging the officers with a raised metal rod, and that established Supreme Court precedent protects Officer Torres's right to defend himself with deadly force from a potentially deadly attack.

"Qualified immunity shields government officials from liability for civil damages for torts committed while performing discretionary duties unless their conduct violates a clearly established statutory or constitutional right." *Stephens v. DeGiovanni*, 852 F.3d 1298, 1314 (11th Cir. 2017) (quoting *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008)). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir. 2002) (internal citations and quotations omitted).

To establish qualified immunity, an officer must first show that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. "[T]he burden [then] shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. To meet his burden, a plaintiff must prove that "in the light most favorable to [him], . . . the officer's conduct violated a constitutional right," and that "the right was clearly established" at the time of the violation. *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "Additionally, the standard for determining if an officer violated clearly established law is an objective one and does not include inquiry into the officer's subjective intent or beliefs." *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000).

### A.  Discretionary Duties

To maintain his immunity, Officer Torres must establish that he was acting within his discretionary authority when he stopped Severe.[11] *AHE Realty Assoc., LLC v. Miami-Dade Cnty.,*

---

[11] The Court interprets Severe's estates' arguments in the light most favorable to it, as the summary judgment standard requires. But the Court notes that Severe's estate did not specifically identify where the discretionary duty started and ended, choosing instead to rehash the factual allegations rather than delineating a legal standard to explain them. Its position could be understood as "merely equat[ing] the question of whether the defendants acted lawfully with the question of whether they

*Fla.*, 320 F. Supp. 3d 1322, 1336 (S.D. Fla. 2018) (noting that entitlement to qualified immunity requires that a public official have engaged in a discretionary duty). The term "discretionary authority" "include[s] all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." *Dunn v. City of Boynton Beach*, 192 F. Supp. 3d 1310, 1316–17 (S.D. Fla. 2016) (alteration in original) (quoting *Moore v. Pederson*, 806 F.3d 1036, 1042 (11th Cir. 2015) (en banc)). Without question, "[i]nvestigating crimes, conducting searches, and making arrests are legitimate job-related functions within the discretionary authority of police officers." *Nigro v. Carrasquillo*, 152 F. Supp. 3d 1364, 1368 (S.D. Fla. 2015) (quoting *Mears v. McCulley*, 881 F. Supp. 2d 1305, 1318–19 (N.D. Ala. 2012)) (holding that stop fell within police officer's discretionary authority because he was responding to a report that plaintiff was causing a disturbance), *aff'd*, 663 F. App'x 894 (11th Cir. 2016). For an investigatory stop to be proper, and thus within bounds of an officer's discretionary duty, an officer must have "arguable reasonable suspicion to support [the] stop." *Jackson*, 206 F.3d at 1165–66.

The Court finds that Officer Torres was acting within his discretionary duties because he can "point to specific and articulable facts which, taken together with rational inferences from those facts," would warrant stopping Severe. *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968) (discussing standard for reasonable suspicion). Specifically, Officer Torres stopped Severe in response to Sanders's call alleging a threat from a Black, homeless man carrying a long, metal object and a big black bag. Severe matched that description. There were children and numerous other civilians in the area. Even though Sanders retracted his complaint, he still asked the officers to ensure that

---

acted within the scope of their discretion. The issues are distinct." *Sims v. Metro. Dade Cnty.*, 972 F.2d 1230, 1236 (11th Cir. 1992).

Severe stayed away from the field where the children were—presumably because Sanders was concerned about Severe causing some sort of problem. Therefore, the facts as Officer Torres was aware of them as he approached Severe provided him with a reasonable suspicion that Severe had committed a crime and could be a threat to the civilians in the vicinity. *See Nigro*, 152 F. Supp. 3d at 1368.

### B. Constitutional Violation – Fourth Amendment

Having established that Officer Torres was acting within his discretionary authority, the burden now shifts to Severe's estate to show that Officer Torres violated Severe's Fourth Amendment right to be stopped or seized without excessive force. *See Carr v. Tatangelo*, 338 F.3d 1259, 1268 (11th Cir. 2003), *as amended* (Sept. 29, 2003) (noting that seizure using deadly force "is . . . subject to the reasonableness requirement of the Fourth Amendment" (citing *Tennessee v. Garner,* 471 U.S. 1, 7 (1985))). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). However, "the amount of force used by an officer in seizing and arresting a suspect 'must be reasonably proportionate to the need for that force.'" *Stephens*, 852 F.3d at 1324 (quoting *Lee*, 284 F.3d at 1198); *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) ("Although suspects have a right to be free from force that is excessive, they are not protected against a use of force that is 'necessary in the situation at hand.'" (quoting *Lee*, 284 F.3d at 1197)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *Johnson v. Fort Pierce Police Dep't*, 849 F. Supp. 1543, 1551 (S.D. Fla. 1994).

Under this Circuit's precedent, courts determine whether deadly force is "reasonable" for the purposes of the Fourth Amendment by asking whether "[1] the suspect pose[d] an immediate threat of serious physical harm to officers or others; [2] the suspect committed a crime involving the infliction or threatened infliction of serious harm, such that his being at large represents an inherent risk to the general public; and [3] the officers either issued a warning or could not feasibly have done so before using deadly force." *Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015) (quoting *Penley v. Eslinger*, 605 F.3d 843, 850 (11th Cir. 2010)); *Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015) ("We have held that it is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has 'probable cause to believe that his own life is in peril.'" (quoting *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005))). If the officers are justified in using deadly force, they "need not stop shooting until the threat has ended." *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (noting that if plaintiff had been "clearly incapacitated," the use of continued force would have violated his constitutional rights).

Viewing the record in the light most favorable to Severe's estate, the Court finds that three genuine issues of material fact exist with respect to whether Severe posed an "immediate threat of serious physical harm" to the officers and whether the degree of force was reasonable under the circumstances. Even if these facts were not in dispute, the Court finds that Officer Torres's use of force against Severe was clearly excessive.

### 1. Genuine Issues of Material Fact

The Court begins by examining the three genuine issues of material fact. First, the record does not clearly establish how far apart Severe and Officer Torres were when the shooting began. *E.g.*, *Salvato*, 790 F.3d at 1293 (concluding that an officer used excessive force when she shot a suspect who had initially resisted, but who was retreating, was unarmed, and was outside of

17

striking distance when he was shot); *Mercado v. City of Orlando*, 407 F.3d 1152, 1157–58 (11th Cir. 2005) (finding that qualified immunity was not appropriate where plaintiff was over six feet away and did not pose a clear threat to officers despite holding a knife when he was shot). Each witness offered different testimony about the distance between the two men when the shooting started, with estimates ranging from two to three feet, ten to twelve feet, and beyond. Testimony also indicates that Severe could have been backing up, or otherwise moving away and increasing the distance between himself and Officer Torres. Notably, Sanders and others testified that Severe was not in a position where he could hurt the officers with the rod. The medical examiner also noted that every gunshot wound lacked stipling, residue, imprinting, or any other substance or marking that could have originated from the gun. She testified that this indicated that Officer Torres shot Severe from a distance of at least two or three feet, but no closer.

Second, the record does not clearly establish what Severe was doing in the moments before Officer Torres began to shoot—in particular, whether he was rushing the officers or trying to turn away from the officers and what he was doing with the rod. *Compare Salvato*, 790 F.3d at 1293 (finding that excessive force was unjustified where plaintiff was retreating, unarmed, and outside of striking distance) *with Santana v. Miami-Dade Cnty.*, 688 F. App'x 763, 771–72 (11th Cir. 2017) (finding that qualified immunity was appropriate where undisputed testimony said decedent was armed with a gun, was in a defensive position, ignored commands to drop the gun, attempted to escape, and was pointing the gun in the direction of the officers). *See also Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016) ("[T]he mere presence of a . . . weapon is not enough to warrant the exercise of deadly force and shield an officer from suit. Where the weapon was, what type of weapon it was, and what was happening with the weapon are all inquiries crucial to the reasonableness determination."). The independent witness testimony suggests two plausible but

contradictory scenarios: either Severe was charging the officers with the rod raised like a baseball bat, or he was turning away from the officers with the rod raised to some degree, but not overhead. The autopsy report and medical examiner's testimony do not reconcile the contradictions. They document three bullets that penetrated Severe's back, which suggest that at some point he was turned away from the officers, and the one bullet that penetrated his buttock at an upward angle, which suggests that he could have been shot while on the ground. But her testimony and other gunshot evidence also indicate that Severe was shot six times through his left side. When Severe turned and where he was when the shots began are not clear from these facts. And the medical examiner cannot provide an account of how the scene unfolded based on her examination of Severe's body.

Third, there is conflicting witness testimony about whether Officer Torres continued to use force *after* Severe was incapacitated. *Plumhoff*, 572 U.S. at 777 ("This would be a different case if petitioners had initiated a second round of shots after an initial round had clearly incapacitated [the decedent] and had ended any threat of continued flight, or if [the decedent] had clearly given himself up."). Severe could have become incapacitated at two different moments: (1) when he was shot in his left arm, which held the rod, and (2) when he fell to the ground. The medical examiner testified that Severe was shot three times in the left arm and, although the record is unclear about the order in which the shots were fired, a reasonable conclusion can be drawn that that any one of these shots would have caused him to drop the rod, which may have initially posed a threat to the officers. Also, Officer Torres testified that he stopped shooting after Severe hit the ground and posed no threat. But Rich testified that Officer Torres continued shooting after Severe hit the ground, and Dennis testified that Severe's body kept "jumping" off the ground as bullets struck him. The autopsy results also support a finding that Torres continued shooting after Severe

had fallen to the ground: the bullet that entered Severe's right buttock did so at an upward facing angle, suggesting that Officer Torres shot him from a higher angle.

### 2.   Clearly Excessive Use of Deadly Force

Even assuming Officer Torres's initial decision to use force was reasonable, the Court finds that his ten shots to Severe was clearly excessive as compared to the threat Severe posed. A use of force is clearly excessive when an officer uses a measure of force that exceeds the danger he is in. *See Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009) ("[T]hough the initial use of force (a single Taser shock) may have been justified, the repeated tasering of Oliver into and beyond his complete physical capitulation was grossly disproportionate to any threat posed and unreasonable under the circumstances."). *See also Stephens*, 852 F.3d at 1324 ("[T]he amount of force used by an officer in seizing and arresting a suspect must be reasonably proportionate to the need for that force." (quoting *Lee*, 284 F.3d at 1198) (internal quotations omitted)).

Independent witnesses described Severe as frail, old, and not agile. Those witnesses stated that Severe turned from the officers as Officer Torres began shooting. Witnesses testimony that Officer Torres shot Severe several times even after he fell to the ground is buttressed by the medical examiner's findings that Severe had entry wounds to his back and buttock. Notably, Officer Torres has not presented the Court with a reasonably detailed explanation for his need to repeatedly shoot Severe as he stood before the officers and as he laid on the ground.[12] So, under

---

[12] Defendants cite *Shaw v. City of Selma* in support of their argument that Officer Torres's use of force was appropriate. 884 F.3d 1093 (11th Cir. 2018). There, the Eleventh Circuit found that the use of one shot was appropriate where the decedent carried a hatchet, was within a few feet of the officer (and edging closer still), and was enticing the officer to shoot him—including by directly saying, "[s]hoot it!" *Id.* at 1097, 1099. The facts presented here could not be more different— including, most notably, as to the type of weapon at issue (a hatchet versus a rod) and the amount of force used (one shot versus ten). *See also Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2019) (use of lethal force appropriate where it was used to incapacitate, not kill, suspect who wielded knife,

these circumstances, the Court finds that the deadly force used by Officer Torres was clearly excessive and disproportionate to any threat posed by Severe.

### C. Clearly Established Law

Having determined that Officer Torres violated Severe's constitutional right to be stopped and/or seized free of excessive force, the Court must now ascertain whether that right was clearly established at the time of the incident such that Officer Torres is not entitled to qualified immunity.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202, *receded from by Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (affirming *Saucier's* two-step sequence for resolving qualified immunity claims but allowing courts to "exercise their sound discretion in deciding which of the two prongs should be addressed first in light of circumstances in the particular case at hand"). The Eleventh Circuit employs two methods to determine if a right is clearly established. *Stephens*, 852 F.3d at 1315. Under the first method, the Court looks at "the relevant case law at the time of the violation; the right is clearly established if a concrete factual context exists so as to make it obvious to a reasonable government actor that his actions violate federal law." *Id.* (quoting *Fils v. City of Aventura,* 647 F.3d 1272, 1291 (11th Cir. 2011)). Under the second method, the Court looks "not at case law, but at the *officer's conduct*, and inquires whether that conduct 'lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the officer, *notwithstanding the lack of fact-specific case law*.'" *Id.* (quoting *Fils*, 647 F.3d at 1291) (emphasis in original). Actions that fall under this second method—deemed

---

stood within a few feet of a bystander, had refused commands to drop the knife, and had been reported to be behaving erratically and "hacking" at a tree with the knife).

obvious-clarity cases—are the exception to the rule that a controlling and similar case must establish a constitutional violation. *Id.*

### 1. Relevant Case Law

In 2015, the Eleventh Circuit's precedent was clearly established that the use of excessive force—and particularly the use of excessive *deadly* force—while investigating a suspect, making a stop, or making an arrest violated the Fourth Amendment. As discussed *supra*, force is considered excessive when officers use an amount that is not proportional to its need. *E.g.*, *Oliver*, 586 F.3d at 907–08. S*ee also Shaw v. City of Selma*, 884 F.3d 1093, 1099 (11th Cir. 2018). By the same token, police officers may not continue to use force on an incapacitated individual. *E.g.*, *Rubio v. Lopez*, 445 F. App'x 170, 174 (11th Cir. 2011) (noting that "it is clear that an officer cannot use gratuitous force against an incapacitated arrestee"); *Oliver*, 586 F.3d at 908 (holding that repeated tases after decedent was incapacitated was clearly excessive); *Hadley*, 526 F.3d at 1330 (holding that physical force against subdued suspect was excessive despite suspect's paranoid demeanor and drug use). *See also Garner,* 471 U.S. at 11 (noting that deadly force is not justified "[w]here the suspect poses no immediate threat to the officer and no threat to others").

In *Oliver v. Fiorino*, the decedent was repeatedly shocked by the police officer's taser, ultimately causing his death. 586 F.3d at 905. The Eleventh Circuit held this was clearly excessive because, although some erratic behavior may have justified an initial tasing to ensure compliance, it was not clear that the decedent posed a threat warranting repeated uses of the taser. *Id.* at 907. *See also Morton v. Kirkwood*, 707 F.3d 1276, 1284–85 (citing *Riley v. City of Montgomery*, 104 F.3d 1247, 1251 (11th Cir. 1997) (holding that the use of repeated shots against a decedent sitting in a car was clearly excessive where plaintiff's version of events was not "inherently incredible"). And in *Gilmere v. City of Atlanta*, the Eleventh Circuit found that a shot to the stomach during a

"scuffle" was excessive, despite the decedent's earlier threat to a bystander with a firearm, attempt to flee, and prior blows exchanged with the police.[13] 774 F.2d 1495, 1497 (11th Cir. 1985). The Court pointed out that controlling precedent disavowed deadly force where it was uncalled for in the situation—in *Gilmere*, characterized by the decedent's retreat from the officers and intoxication. *Id. See also McKinney v. DeKalb Cnty.*, 997 F.2d 1440, 1443 (11th Cir. 1993) (finding that use of five shots was not reasonable on suicidal boy, who held butcher knife and stick, then threw the stick at officers and began to stand up while still holding the knife, all while in close range of officers).

Based on these precedents, no objectively reasonable officer in Officer Torres's position could have thought that shooting Severe ten times was a constitutionally permissible use of force here. To begin, witness testimony asserts that Severe was not able to hit the officers from the distance where he stood; nor was he in a physical condition to harm them. Severe's estate also disputes that Severe was charging the officers or waving the rod overhead. It contends that Severe was moving away when the first shots were fired, a scene with which the medical examiner's report and testimony and the testimony of other witnesses may "reasonably be harmonized." *Morton*, 707 F.3d at 1284. Namely, the eyewitness testimony asserts that Officer Torres may have continued to fire on Severe after Severe's arm had been struck *and* after Severe attempted to retreat and he fell to the ground. The medical examiner's report—detailing three shots to Severe's arm, which could have made him drop the rod, and four bullet wounds to his back, one of which entered his buttock at an upward angle—corroborates the eyewitness testimony. If true, Severe posed no

---

[13] The Court notes that the test used to determine whether force was excessive in *Gilmere* was abrogated by the Supreme Court in *Graham v. Connor*. 490 U.S. at 393–94. Nevertheless, the Court follows the Eleventh Circuit's repeated precedents relying on *Gilmere*'s fact pattern and conclusion. *E.g.*, *Salvato*, 790 F.3d at 1294 (citing *Gilmere*'s reasoning with approval).

threat after either of those moments. But as this Circuit's precedents dictate, any further use of force after Severe was incapacitated was gratuitous. Accordingly, viewing the facts in the light most favorable to Severe, Officer Torres's repeated use of deadly force was not objectively reasonable and clearly exceeded the danger Severe posed with his rod under Eleventh Circuit precedent.

### 2. Obvious Clarity Cases

The Court also finds that this action falls within the realm of the obvious-clarity cases. "In an obvious-clarity case, where the officer's conduct is plainly objectively unreasonable, a court does not need prior case law to determine the force used by the officer was excessive and unlawful, because it was disproportionate." *Stephens*, 852 F.3d at 1318. Rather, "the salient question . . . is whether the state of the law . . . gave [the officers] *fair warning* that their alleged treatment of [the plaintiff] was unconstitutional." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (emphasis added)). S*ee also Oliver*, 586 F.3d at 906–07 (finding qualified immunity inappropriate because the use of repeated taser shocks was so disproportionate to decedent's struggle that it fit the mold of other obvious-clarity cases).

Considering the evidence in the light most favorable to Severe's estate, the Court finds that Office Torres's use of deadly force against Severe was "so far beyond the hazy border between excessive and acceptable force [that every objectively reasonable officer] had to know he was violating the Constitution even without caselaw on point." *Vinyard*, 311 F.3d at 1355 (citing *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000)). For the reasons detailed above, the Court finds that no objectively reasonable officer could have thought that repeated use of deadly force against Severe was appropriate based on the totality of the circumstances. And further, continuing to use deadly force after Severe was incapacitated was gratuitous and grossly

outweighed the measure of danger Severe posed to the officers. Indeed, Officer Torres's use of force far exceeds other uses of excessive force found impermissible. *See supra* at pp. 22–24. *See also Stephens,* 852 F.3d at 1325–26 (collecting cases). As such, Officer Torres's use of force is plainly encompassed by the obvious-clarity precedents.

Because the law as established in June 2015 gave Officer Torres "fair warning that [his] alleged treatment of [Severe] was unconstitutional," qualified immunity does not protect his actions. *Stephens*, 852 F.3d at 1316–18. The Court therefore denies summary judgment on Count II and finds that Officer Torres is not entitled to qualified immunity.

## IV.   Florida Wrongful Death Claim

Severe's estate also brings claims against Officer Torres and the City under Florida's Wrongful Death Act, Fla. Stat. §§ 768.16–768.28. Defendants argue that these claims are barred because there is no cause of action for the negligent use of force under Florida law. Severe's estate conceded at argument that there is no claim for negligent use of force, but argued that the claims could still proceed under negligence because a reasonable officer would not have shot Severe under the same circumstances.

The Court agrees that there is no claim for negligent use of force under Florida law. *Fontanez v. Lamberti,* No. 10-cv-61428, 2011 WL 4499016, at *13 (S.D. Fla. Sept. 27, 2011). In the Complaint, Severe's estate alleges that "police officers have a common-law duty to exercise reasonable care in carrying out their law-enforcement responsibilities" which was breached when Officer Torres shot Severe, and that no reasonable officer would have found force or deadly force necessary in that situation.[14] [ECF No. 1 ¶¶ 69, 70, 71, 80, 81, 82]. Severe's estate therefore does

---

[14] Although claims for negligent decision-making or negligent use of a firearm can arise under Florida law, Severe's estate does not allege those in the Complaint. *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1263–64 (11th Cir. 2001). Thus, the Court cannot consider such claims.

not distinguish his claims from ones for negligent use of force. Thus, Counts III and IV must be dismissed with prejudice.[15]

<b><u>CONCLUSION</u></b>

Accordingly, it is **ORDERED AND ADJUDGED** that

(1) Defendants' Motion for Summary Judgment [ECF No. 56] is **GRANTED IN PART AND DENIED AND PART**.

(2) The remaining parties shall appear before the Court for a status conference on July 17, 2019.

(3) Defendants' Motion in Limine to Exclude Testimony of Mr. Charles Drago [ECF No. 58] is **GRANTED IN PART AND DENIED IN PART**. The Motion is **GRANTED** as to Mr. Drago's opinion regarding the City's failure to supervise and train its officers in the use of deadly force (listed in his expert report as opinions 2 and 3). It is **DENIED** as to all other opinions.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 25th day of June, 2019.

DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE

---

[15] Because Severe's estate's state law claims are dismissed with prejudice, the Court need not consider the Stand Your Ground defense, Fla. Stat. § 776.012, asserted by Officer Torres.

# Appendix A

